Barry I. Levy
Michael A. Sirignano
John P. Mulvaney
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,
GEICO Indemnity Company, GEICO General Insurance Company
and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY, and          Docket No.:_____ (      )
GEICO CASUALTY COMPANY,

                                    Plaintiffs,

                                                              **Plaintiff Demands a Trial by Jury**

              -against-

LUMAX, INC., PAVEL BALYKOV, and JOHN DOE
DEFENDANTS 1 through 10,

                                    Defendants.
------------------------------------------------------------------X

## COMPLAINT

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company, and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Lumax, Inc., Pavel Balykov, and John

Doe Defendants 1 through 10 (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      GEICO brings this action to recover more than $449,000.00 that Defendants

Lumax, Inc. ("Lumax") and Pavel Balykov ("Balykov") (collectively, the "DME Defendants")

have wrongfully obtained from GEICO by submitting, and causing to be submitted, hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical collars, lumbar-sacral supports, orthopedic pillows, massagers, knee orthotics, shoulder orthotics, egg crate mattresses, etc.) (collectively, the "Fraudulent Equipment"), allegedly provided to New York automobile accident victims who were insured by GEICO ("Insureds").

2.      Lumax, which is owned and controlled by Balykov, is a "retailer" that purports to sell and/or rent DME and OD to Insureds. With the help of John Doe Defendants 1 through 10 (hereinafter, the "John Doe Defendants"), Balykov devised and implemented a scheme to submit large volumes of billing to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

3.      Specifically, the DME Defendants entered into illegal kickback and patient referral arrangements with individuals, who are not presently identifiable by GEICO but are associated with various multi-disciplinary medical offices that cater primarily to patients with no-fault insurance (the "Clinics"), in order to obtain prescriptions from the various physicians and other healthcare providers (the "Prescribing Providers") who prescribed DME and OD to the Insureds treating at the Clinics. By doing so, DME Defendants knowingly obtained a large volume of illegitimate DME and OD prescriptions in order to have a basis to submit billing for the Fraudulent Equipment to GEICO and other New York automobile insurance carriers. DME Defendants did so for the purpose of maximizing their profits without any regard for whether the Fraudulent Equipment provided was actually needed by any Insured.

4.      GEICO seeks to recover more than $449,000.00 that has been wrongfully obtained by the DME Defendants, and further seeks a declaration that it is not legally obligated to pay

reimbursement of more than $330,000.00 in pending no-fault insurance claims that have been submitted through Lumax because:

(i) The DME Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and patient referral arrangements with others who are not presently identifiable;

(ii) The DME Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was prescribed and dispensed - to the extent that any was provided - pursuant to prescriptions issued by the Prescribing Providers as a result of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(iii) The DME Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent any was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

(iv) To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the DME Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds; and

(v) To the extent that any Fraudulent Equipment was provided, the bills for the Fraudulent Equipment submitted to GEICO by the DME Defendants fraudulently and grossly inflated the permissible reimbursement rate that the DME Defendants could have received for the Fraudulent Equipment.

5.    The Defendants fall into the following categories:

(i) Defendant Lumax is a New York corporation that purports to sell and/or rent Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and bills New York automobile insurance companies, including GEICO;

(ii) Defendant Balykov owns, operates, and controls Lumax and uses it to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims; and

(iii) John Doe Defendants are individuals and entities, not presently identifiable, who are associated with the Prescribing Providers and various Clinics, and

who conspired with Lumax and Balykov to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

6.     As discussed below, the DME Defendants always have known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)     The Fraudulent Equipment was provided – to the extent that any was provided – based upon prescriptions received as a result of unlawful kickback and patient referral arrangements between the DME Defendants and others who are not presently identifiable and, thus, not eligible for no-fault insurance reimbursement in the first instance;

(ii)    The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent that any was provided – pursuant to predetermined fraudulent protocols designed solely to financially enrich the DME Defendants and others not presently known rather than to treat or otherwise benefit the Insureds;

(iii)   The Fraudulent Equipment was provided – to the extent that any equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions;

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the DME Defendants to GEICO – and other New York automobile insurers – fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds as the HCPCS codes identified in the bills did not accurately represent what was actually provided to Insureds; and

(v)     To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the DME Defendants to GEICO – and other New York automobile insurers – fraudulently and grossly inflated the permissible reimbursement rate that the DME Defendants could have received for the Fraudulent Equipment.

7.     As such, the DME Defendants do not now have – and never had – any right to be compensated for their claims for the Fraudulent Equipment billed to GEICO.

8.     The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that the DME Defendants submitted, or caused to be submitted, to GEICO pursuant to the DME Defendants' fraudulent scheme.

9.      Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began no later than April 2019 and the scheme has continued uninterrupted as DME Defendants continue to seek payment on the fraudulent charges submitted to GEICO.

10.     As a result of the Defendants' scheme, GEICO has incurred damages of more than $449,000.00.

## THE PARTIES

### I.      Plaintiffs

11.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal place of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.     Defendants

12.     Defendant Lumax is a New York corporation that was incorporated on or about April 10, 2019, and has its principal place of business in Kings County, New York.

13.     Defendant Balykov is a citizen of New York and, at all relevant times, has owned and operated Lumax. Defendant Balykov is not and has never been a licensed healthcare provider.

14.     Defendants Balykov and Lumax are no strangers to no-fault insurance fraud schemes.  In fact, Balykov and Lumax were named as defendants in a no-fault insurance fraud lawsuit filed in this district alleging, among other things, that Balykov and Lumax paid kickbacks in exchange for patient referrals, obtained prescriptions and dispensed DME and/or OD pursuant to a predetermined protocol, and misrepresented the amount of reimbursement to which they were entitled. See Allstate Ins. Co. et al. v. Lumax, Inc., et al., 23-cv-5914 (E.D.N.Y.).

15.     The John Doe Defendants are all citizens of New York. The John Doe Defendants are individuals and entities, not presently identifiable, who are associated with the Prescribing Providers and various Clinics, and who conspired with DME Defendants to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

18.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

20.     GEICO underwrites automobile insurance in the State of New York.

**I.      An Overview of the Pertinent Laws**

**A.      Pertinent Laws Governing No-Fault Insurance Reimbursement**

21.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

22.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

23.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD.  See N.Y. Ins. Law § 5102(a).

24.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

25.     Pursuant to the No-Fault Laws, healthcare services providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

26.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed

(Emphasis added).

27.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD.  See, e.g., N.Y. Educ. Law §§ 6509(10), 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

28.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party." See N.Y. Educ. Law §§ 6509(10), 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

29.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially valid license to determine whether there was a failure to abide by state and local law.

30.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

31.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

32.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information

8

concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

33.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Regulations Governing No-Fault Benefits for DME and OD**

34.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME and OD that were provided pursuant to a lawful prescription from a licensed healthcare provider.  See N.Y. Ins. Law § 5102(a).  By extension, DME and OD that were provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

35.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes.  For example, DME can include items such as bed boards, cervical pillows, electric heating pads, orthopedic mattresses, infrared heat lamps, hand-held massagers, lumbar cushions, wheelchair cushions, cervical traction units, and whirlpool baths.

36.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of the spine, joints, or limbs.  These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar-sacral orthotics ("LSOs"), knee orthotics, ankle supports, wrist braces, and the like.

37.     To ensure that Insureds' $50,000.00 in maximum PIP Benefits are not artificially depleted by inflated DME or OD charges, the New York Fee Schedule sets forth maximum charges that may be submitted by healthcare providers for DME and OD.

38.     In a June 16, 2004, Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

39.     As it relates to charges for dispensing DME and OD provided before April 4, 2022, the New York Fee Schedule set forth the maximum charges as follows:

> (a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
> (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or
>
> (2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2(a) (2021).

40.     Under the New York Fee Schedule, payment for DME or OD provided before April 4, 2022, is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

41.     According to the New York Fee Schedule, in instances where Medicaid has established a maximum permissible charge for DME or OD ("Fee Schedule item"), the fee payable for the item is set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

42.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS code.

43.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS codes promulgated by Palmetto. Medicaid has specifically defined the HCPCS codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Guidelines") which mimic the definitions set forth by Palmetto.

44.     Where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

45.     Additionally, many HCPCS codes relate to OD that has either been prefabricated, custom-fitted and/or customized. Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

46. As it relates to charges for renting DME provided before April 4, 2022, the New York Fee Schedule set forth the maximum charges as follows:

> [t]he maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule.

See 12 N.Y.C.R.R. § 442.2(b) (2021).

47. When DME is rented and charged to automobile insurers using HCPCS codes that are recognized by the Medicaid Fee Schedule but do not contain a maximum reimbursement amount, the maximum charge for a monthly rental is 10% of the acquisition cost for the DME. See New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines, p. 16; see also Gov't Emples. Ins. Co. v. MII Supply LLC, Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Co., December 4, 2019) (applying the 10% of acquisition cost rule for DME rentals within the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines to No-Fault reimbursement for HCPCS codes that are recognized by the Medicaid Fee Schedule but do not contain a reimbursement amount).

48. For charges related to rental cost of Non-Fee Schedule items, the maximum monthly rental cost, as per the New York Fee Schedule, is the monthly cost to the general public because the New York State Department of Health has not established a price for DME rentals and defers as a matter of policy to the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines.

49. Regardless of whether DME or OD is sold or rented to patients, the maximum reimbursement rates set forth above includes all shipping, handling, and delivery. See 12

N.Y.C.R.R. § 442.2(c). As such, DME/OD suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up of any DME or OD.

50.    Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either an NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)    The DME or OD is based upon a legitimate prescription by a healthcare practitioner that is licensed to issue such prescriptions, and for a reasonable and medically necessary item;

(ii)    The prescription for DME or OD was not issued pursuant to any unlawful financial arrangements;

(iii)    The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(iv)    The HCPCS code identified in the bill actually represents the DME or OD that was provided to the patient; and

(v)    The fee sought for DME or OD provided to an Insured was not in excess of the price contained in the Medicaid Fee Schedule or the standard for a Non-Fee Schedule item.

## II.    The Defendants' Fraudulent Scheme

### A.    Overview of the Defendants' Fraudulent Scheme

51.    Beginning in or about 2019, Balykov, with the aid of the John Doe Defendants, implemented a complex fraudulent scheme in which Lumax was used as a vehicle to bill GEICO and other New York automobile insurers for No-Fault Benefits that it was never entitled to receive. In fact, Lumax has billed GEICO alone more than $1,200,000.00 to date.

52.    Balykov used Lumax to directly obtain No-Fault Benefits and maximize the payments he could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for Fraudulent Equipment without regard for genuine patient care.

53.    To date, the DME Defendants have wrongfully obtained more than $449,000.00 from GEICO and there is more than $330,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the DME Defendants continue to seek payment of from GEICO.

54.    The DME Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining prescriptions for Fraudulent Equipment purportedly issued by the Prescribing Providers because of secret kickback and patient referral agreements with John Doe Defendants, who are not presently identifiable.

55.    Pursuant to the kickback and patient referral arrangements, the DME Defendants obtained prescriptions for Fraudulent Equipment that were purportedly issued by Prescribing Providers who claimed to have treated the Insureds at their respective Clinics.  Specifically, at the direction of the others who are not presently identifiable, including John Doe Defendants, the Prescribing Providers—in those instances where Prescribing Providers actually signed or authorized the prescriptions—would issue nearly identical prescriptions for DME and/or OD each time they issued a prescription that would be filled by Lumax.

56.    In keeping with the fact that the DME and OD prescriptions were provided pursuant to illegal kickback and patient referral arrangements, DME Defendants received the prescriptions directly from the Prescribing Providers or individuals associated with the Clinics, including John Doe Defendants, without any contact or communication with the Insureds.

57.    Once the DME Defendants received the prescriptions from the Prescribing Providers, the DME Defendants would submit either NF-3 or HCFA-1500 forms (i.e., bills) to GEICO seeking reimbursement for Fraudulent Equipment by listing specific HCPCS Codes identifying the types of Fee Schedule and/or Non-Fee Schedules items that were purportedly provided to the Insureds.

58.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the DME Defendants indicated that they provided Insureds with the particular item associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by the Prescribing Provider, who was licensed to prescribe DME and/or OD.

59.     As part of their scheme, DME Defendants attempted to maximize the amount of No-Fault Benefits that they could obtain from GEICO by submitting bills to GEICO that misrepresented the Fraudulent Equipment purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – by listing HCPCS Codes indicating that a specific item was dispensed to Insureds when, in reality, the item dispensed to Insureds was often an inexpensive, generic, and/or poor-quality item that did not contain all of the features required by the HCPCS Codes billed to GEICO.

60.     Indeed, the DME Defendants engaged in a pattern of submitting bills to GEICO, and other automobile insurers, seeking No-Fault Benefits based on HCPCS codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was permissible.

61.     In a substantial majority of the charges for Fraudulent Equipment identified in Exhibit "1" – to the extent that any Fraudulent Equipment was actually provided to the Insureds – the Fraudulent Equipment did not match the HCPCS Codes identified in the bills submitted to GEICO by the DME Defendants. To the extent the items actually dispensed by DME Defendants qualified for reimbursement under different HCPCS Codes, the maximum reimbursement rates under such HCPCS Codes was significantly lower than the reimbursement rates under the HCPCS codes identified in the bills submitted by the DME Defendants.

62.     DME Defendants also engaged in a pattern of submitting bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the <u>lesser</u> of 150% of the DME Defendants' legitimate acquisition cost or the cost to the general public for the same item.

63.     In actuality, the bills from the DME Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of the DME Defendants' legitimate acquisition cost or the cost to the general public.

64.     The DME Defendants submitted bills to GEICO, and other automobile insurers, seeking No-Fault Benefits for Fraudulent Equipment at rates that were grossly above the permissible reimbursement amount for Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits that they could receive.

65.     As part of this scheme, the DME Defendants submitted bills to GEICO with reimbursement rates that indicated the Fraudulent Equipment purportedly provided Insureds were expensive and high-quality when, in fact, the Fraudulent Equipment provided were cheap and poor-quality.

66.     Moreover, the cheap and poor-quality Fraudulent Equipment that DME Defendants provided to the Insureds – again, to the extent that any Fraudulent Equipment was actually provided – were purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.  In keeping with that fact, the cheap and poor-quality Fraudulent Equipment dispensed by the DME Defendants were often easily obtainable from legitimate internet or brick-and-motor retailers for a small fraction of the reimbursement rates identified in the bills submitted to GEICO by the DME Defendants.

67.     In sum, after obtaining vague and generic prescriptions for Fraudulent Equipment purportedly issued by the Prescribing Providers as a result of the illegal kickback and patient referral arrangements, the DME Defendants would bill GEICO for the sale of Fraudulent Equipment that: (i) was not reasonable or medically necessary; (ii) was not based on valid prescriptions from licensed healthcare providers; (iii) did not correspond to the HCPCS codes contained in the bills submitted to GEICO; (iv) was billed at grossly inflated reimbursement rates; and (v) was otherwise not reimbursable.

**B.     The Defendants' Illegal Kickback and Patient Referral Arrangements**

68.     To obtain access to Insureds so the Defendants could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers, the Defendants entered into unlawful financial agreements with others who are not presently identifiable (e.g., John Doe Defendants) where prescriptions for Fraudulent Equipment were provided to the Defendants in exchange for financial consideration.

69.     Since the inception of the fraudulent scheme, the DME Defendants engaged in unlawful financial arrangements with the John Doe Defendants, including paying kickbacks to the John Doe Defendants in exchange for obtaining prescriptions for Fraudulent Equipment that could be provided by Lumax.  The unlawful financial arrangements allowed the DME Defendants to submit hundreds of charges for Fraudulent Equipment to GEICO and other New York automobile insurers.

70.     The DME Defendants were able to enter unlawful financial arrangement schemes with others who are not presently identifiable in order to obtain prescriptions purportedly issued

by the Prescribing Providers because the Prescribing Providers operated at Clinics that are actually organized as "one-stop" shops for no-fault insurance fraud.

71.    Although ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of these Clinics operate under the unlawful ownership and control of unlicensed laypersons and are actually nothing more than multidisciplinary medical mills organized to be convenient one-stop shops for No-Fault insurance fraud.

72.    At such Clinics, unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and directed fraudulent protocols used to maximize profits without regard to actual patient care.

73.    In keeping with the fact that unlicensed laypersons controlled many of the Clinics and that the DME Defendants paid unlawful kickbacks in exchange for patient referrals, GEICO has identified in a series of related investigations that a group of unlicensed laypersons combined to misappropriate and illegally use the name, New York license, signature and other relevant information of healthcare professionals to bill GEICO for services purportedly performed at several locations, including the following Clinics which served as a source of prescriptions for the DME Defendants: (i) 137-42 Guy R Brewer Boulevard, Jamaica; (ii) 79-45 Metropolitan Avenue, Flushing; (iii) 1735 Pitkin Avenue, Brooklyn; and (iv) 2017-2019 Williamsbridge Road, Bronx. See Gov't Emples. Ins. Co., et al. v. Gary Grody a/k/a Lance Grody, et al., Dkt. No. 22-cv-03598 (BMC)(E.D.N.Y.); Gov't Emples. Ins. Co., et al. v. Gary Grody a/k/a Lance Grody, et al., Dkt. No. 22-cv-06187(KAM)(PK) (E.D.N.Y.); Gov't Emples. Ins. Co., et al. v. Susan J. Polino PhD., et al., Dkt. No. 1:22-cv-05178(ARR)(PK) (E.D.N.Y.); Gov't Emples. Ins. Co., et al. v. Lynn Curcuro Consulting, Ltd., et al., Dkt. No. 1:22-cv-04543(ARR)(RLM) (E.D.N.Y.); Gov't Emples. Ins. Co., et al. v. Poonawala, et al., Dkt. No. 1:22-cv-03063(PKC)(VMS) (E.D.N.Y.); Gov't

<u>Emples. Ins. Co., et al. v. Bily-Linder, et al.</u>, Dkt. No. 1:23-cv-00515(FB)(RML) (E.D.N.Y.); <u>Gov't Emples. Ins. Co., et al. v. Puzaitzer, et al.</u>, Dkt. No. 1:23-cv-07465(CLP) (E.D.N.Y.).

74.     Further, GEICO has received billing from many of the Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

75.     In addition to serving as the source of the prescriptions the DME Defendants would use to support the charges identified in Exhibit "1," the Clinics also served as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

76.     For example, GEICO has received billing for purported healthcare services rendered at the Clinic located at 79-45 Metropolitan Ave., Flushing, New York from over 80 purportedly different healthcare providers. In addition, GEICO has received billing for purported healthcare services rendered at the Clinic located at 137-42 Guy R Brewer Boulevard, Jamaica from over 30 purportedly different healthcare providers.

77.     Pursuant to the unlawful financial arrangements, Balykov would pay kickbacks to individuals associated with the Clinics, including John Doe Defendants, or, upon information and belief, to fictitious businesses associated with them, in order to obtain referrals for the Fraudulent Equipment to be provided to motor vehicle accident victims who treated at the Clinics.

78.    In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, including illegal kickbacks, between the DME Defendants and individuals associated with the Clinics, including John Doe Defendants, Balykov never met most, if not all, of the Prescribing Providers who issued the prescriptions that were provided to the DME Defendants.

79.    In keeping with the fact that the Defendants engaged in unlawful financial arrangements, the DME Defendants obtained prescriptions for Fraudulent Equipment directly from individuals associated with the Clinics, including John Doe Defendants, without any communication or involvement by the Insureds.

80.    In keeping with the fact that the prescriptions for Fraudulent Equipment were sent to DME Defendants at the direction of John Doe Defendants without any involvement by the Insureds, the prescriptions issued, or purportedly issued, by the Prescribing Providers were provided directly to the Clinics' staff who then submitted the prescriptions directly to the DME Defendants.

81.    In further support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the DME Defendants and from individuals associated with the Clinics, including John Doe Defendants, the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to predetermined treatment protocols – as explained below.

82.    In keeping with the fact that access to patients at the Clinics was provided pursuant to illegal kickback and patient referral arrangements, one of the Prescribing Providers, Augustus Igbokwe, P.A., was sued based on allegations that he issued fraudulent prescriptions for

pharmaceuticals in exchange for kickbacks. See Liberty Mutual Ins. Co., et al. v. AVK Rx, Inc., et al., 1:22-cv-07329(GRB)(SIL) (E.D.N.Y.).

83.     By of further example, another Prescribing Provider, Kyungsook Bu, N.P., is no stranger to no-fault insurance fraud schemes, as he has sued based on allegations that he entered into arrangements by which he allowed unlicensed laypersons to own and control healthcare practices in his name and to submit fraudulent billing medically unnecessary services through such healthcare practices. See Gov't Emples. Ins. Co., et al. v. Liana Binns, N.P., et al., Dkt. No. 1:22-cv-01553(NGG)(PK) (E.D.N.Y.).

84.     Pursuant to the unlawful kickback and patient referral arrangements, the DME Defendants paid others not presently known who were able to direct prescriptions for Fraudulent Equipment purportedly issued by the Prescribing Providers to the DME Defendants, which the DME Defendants used as a basis to support their fraudulent bills to GEICO.

85.     But for the payment of kickbacks from the DME Defendants, the individuals associated with the Clinics, including John Doe Defendants, in conjunction with the Prescribing Providers, would not have had any reason to direct a substantial volume of medically unnecessary prescriptions to Lumax.

86.     The payment of kickbacks by the DME Defendants was made at or near the time the prescriptions were issued, but the DME Defendants and the John Doe Defendants affirmatively concealed the particular amounts paid because the payment of kickbacks in exchange for patient referrals violates New York law.

87.     In support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful kickback and patient referral arrangements, and as explained in detail below, the prescriptions were not medically necessary and were provided pursuant to predetermined

fraudulent protocols that provided Insureds with predetermined sets of nearly identical Fraudulent Equipment.

88.     As a result of the unlawful financial arrangements, the DME Defendants drastically increased the volume of their billing to GEICO and other New York automobile insurers for Fraudulent Equipment.

89.     In all of the claims identified in Exhibit "1," the DME Defendants falsely represented that Fraudulent Equipment was dispensed to Insureds pursuant to lawful prescriptions from healthcare providers and were therefore eligible to collect No-Fault Benefits in the first instance, when, in reality, the DME Defendants obtained the prescriptions pursuant to unlawful kickback and patient referral arrangements.

**C.     The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols**

90.     In addition to the DME Defendants' unlawful kickback and patient referral arrangements, pursuant to agreements with others who are not presently identifiable, the DME Defendants obtained prescriptions for Fraudulent Equipment purportedly issued pursuant to predetermined fraudulent protocols, which were designed to maximize the billing that the DME Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

91.     In the claims identified in Exhibit "1," virtually all of the Insureds were involved in relatively minor and low impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

92.     In fact, almost none of the Insureds identified in Exhibit "1," whom the Prescribing Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

93.     In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

94.     To the extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

95.     However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the Prescribing Providers were subject to extremely similar treatment including nearly identical prescriptions for the Fraudulent Equipment.

96.     No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

97.     The prescriptions that Lumax used to support its charges for sale of Fraudulent Equipment identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols associated with the particular Prescribing Providers at each Clinic, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

98.     No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

99.    In general, the DME Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Prescribing Providers pursuant to the following predetermined fraudulent protocols:

- an Insured would arrive at a Clinic for treatment following a motor vehicle accident;

- the Insured would be seen by a Prescribing Provider;

- at the initial and/or one of the follow-up visits, the Prescribing Provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME and/or OD, although the Prescribing Provider did not always treat the Insured on the date that the prescription for DME and/or OD was issued;

- the Prescribing Provider at a specific Clinic would choose DME and/or OD that was virtually identical to the DME and/or OD that the Prescribing Provider prescribed to every other Insured at the Clinic whose prescriptions would be filled by Lumax; and

- prescriptions for DME and/or OD would be directly provided to the DME Defendants to fill by individuals associated with the Clinics, without any involvement by the Insured.

100.    Virtually all the claims identified in Exhibit "1" for the Fraudulent Equipment are based upon medically unnecessary prescriptions for predetermined sets of Fraudulent Equipment, which were purportedly issued by the Prescribing Providers who practiced at various Clinics across the New York metropolitan area.

101.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

102.    Furthermore, in a legitimate setting, during a patient's course of treatment, a healthcare provider <u>may</u> – but not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

103.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

104.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident. For example, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in an automobile accident.

105.    If a healthcare provider determines that DME and/or OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD why any of the prescribed Fraudulent Equipment was medically necessary or how it would help the Insureds.

106.    It is improbable – to the point of impossibility – that virtually all the Insureds identified in Exhibit "1" who treated with a specific Prescribing Provider would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

107.    Here, and in keeping with the fact that the prescriptions provided to the DME Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibit "1" that

treated at a specific Clinic were issued substantially similar prescriptions for a predetermined set of Fraudulent Equipment.

108.    In keeping with the fact that the prescriptions for Fraudulent Equipment used by the DME Defendants to support the charges identified in Exhibit "1" were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, many of the prescriptions were purportedly issued on dates that the Insureds never treated with the Prescribing Provider.

109.    Also, in keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols, and not for the benefit of the Insureds – as set forth below – nearly all of the Prescribing Providers issued similar checkmark-based prescriptions and routinely issued multiple checkmark-based prescriptions to a single patient on the same day when there was no legitimate reason to do so.

110.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to predetermined fraudulent protocols, to the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain the basis for prescribing – and frequently failed to identify at all – the Fraudulent Equipment identified on the prescriptions that DME Defendants used to dispense items and to bill GEICO for the charges identified in Exhibit "1."

111.    Even more, and as also explained below in more detail, the charges to GEICO identified in Exhibit "1" were not based upon prescriptions for medically necessary Fraudulent Equipment because the DME Defendants purportedly provided Insureds with whatever DME or OD that they wanted, even when the Fraudulent Equipment purportedly provided – and billed to

GEICO – was not the item identified in the prescriptions purportedly issued by the Prescribing Providers.

112.    In further keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibit "1" were not medically necessary but were the result of predetermined fraudulent protocols, the prescriptions typically contained vague and generic descriptions for DME and OD, which – as explained in more detail below – provided the Defendants with the opportunity to purportedly provide – and bill GEICO for – whatever DME or OD they wanted.

113.    Underscoring that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were issued because of predetermined fraudulent protocols and not based upon medical necessity, the prescriptions purportedly issued by the Prescribing Providers were almost never given to the Insureds, who, consequently, had no choice in what DME provider would dispense their equipment.

114.    Instead, the prescriptions issued by the Prescribing Providers were transmitted directly to the DME Defendants by individuals associated with the Clinics, without any involvement by the Insureds.

115.    For the reasons set forth above, and below, in each of the claims identified in Exhibit "1", the DME Defendants falsely represented that Fraudulent Equipment were provided pursuant to prescriptions from healthcare providers for medically necessary DME and/or OD, and were therefore eligible to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the DME Defendants pursuant agreements with others who are not presently identifiable.

### 1. The Prescribing Providers' Prescription Protocols

116. As alluded to above, the Prescribing Providers purportedly issued prescriptions for the Fraudulent Equipment pursuant to predetermined fraudulent protocols that were established by each Prescribing Provider and/or their respective Clinic. In that regard, and in keeping with the fact that the prescriptions were issued as a result of the illegal kickback and patient referral arrangements, all of the prescriptions that Lumax filled from a particular Prescribing Provider were substantially similar, if not identical, to each other, regardless of variations in the Insureds' individual clinical presentations and medical needs.

117. By way example, many of the prescriptions that were used by DME Defendants to support the charges identified in Exhibit "1" were purportedly issued by Kyungsook Bu, N.P., ("Bu") regarding Insureds treating at the Clinic located at 1735 Pitkin Avenue, Brooklyn.

118. Specifically, virtually every Insured where DME Defendants used prescriptions purportedly issued by Bu to support the charges identified in Exhibit "1," Bu allegedly prescribed the following items: (i) cervical traction equipment; and (ii) a custom-fitted LSO.

119. Further, Bu also prescribed many of the Insureds with the following items that were dispensed by Lumax: (i) bed board; (ii) cervical collar; (iii) mattress; (iv) massager; (v) lumbar cushion; (vi) infrared heat lamp; (vii) a whirlpool device; and (viii) an orthopedic car seat.

120. Underscoring that Bu's prescriptions were issued pursuant to predetermined fraudulent protocols, many of Insureds who were initially prescribed a custom-fitted LSO by Bu, which Lumax billed under HCPCS Code L0627, were also, several weeks later, prescribed a second custom-fitted LSO by Bu, which Lumax billed under HCPCS Code L0637.

121.    In each of the claims where Bu prescribed and Lumax dispensed multiple LSOs to Insureds, the medical records submitted to GEICO contained no legitimate medical justification to support prescribing a single custom-fitted LSO to the Insured, let alone two.

122.    In addition to the items identified above, Bu also prescribed nearly every Insured that complained of a shoulder or knee injury with shoulder and knee orthotics, respectively, which were dispensed by Lumax.

123.    By way of further example, many of the prescriptions that were used by DME Defendants to support the charges identified in Exhibit "1" were purportedly issued by Minnie Choi, N.P. ("Choi") regarding Insureds treating at a Clinic located at 137-42 Guy R. Brewer Boulevard, Jamaica.

124.    Specifically, for the vast majority of Insureds where DME Defendants used prescriptions purportedly issued by Choi to support the charges identified in Exhibit "1," Choi allegedly prescribed the following items: (i) a custom-fitted LSO; (ii) an electric heating pad; (iii) bed board; (iv) cervical collar; (v) mattress; (vi) massager; (viii) lumbar cushion; (ix) infrared heat lamp; (x) a whirlpool device; and (xi) an orthopedic car seat.

125.    Underscoring that Choi's prescriptions were issued pursuant to predetermined fraudulent protocols, many of Insureds who were initially prescribed a custom-fitted LSO by Choi, which Lumax billed under HCPCS Code L0627, were also, several weeks later, prescribed a second custom-fitted LSO by Choi, which Lumax billed under HCPCS Code L0637.

126.    In each of the claims where Choi prescribed and Lumax dispensed multiple LSOs to Insureds, the medical records submitted to GEICO contained no legitimate medical justification to support prescribing a single custom-fitted LSO to the Insured, let alone two.

127.    In addition to the items identified above, Choi also prescribed nearly every Insured that complained of a shoulder or knee injury with shoulder and knee orthotics, respectively, which were dispensed by Lumax. Choi also frequently prescribed the following equipment to Insureds that was dispensed by Lumax: (i) cervical traction equipment; and (ii) an EMS unit.

128.    By way of further example, many of the prescriptions that were used by DME Defendants to support the charges identified in Exhibit "1" were purportedly issued by Augustus Igbokwe, P.A. ("Igbokwe") regarding Insureds treating at a Clinic located at 2017-2019 Williamsbridge Road, Bronx.

129.    Specifically, for the vast majority of Insureds where DME Defendants used prescriptions purportedly issued by Igbokwe to support the charges identified in Exhibit "1," Igbokwe allegedly prescribed the following items: (i) a custom-fitted LSO; (ii) massager; (iii) infrared heat lamp; (iv) a whirlpool device; and (v) an EMS unit.

130.    Underscoring that Igbokwe's prescriptions were issued pursuant to predetermined fraudulent protocols, some of Insureds who were initially prescribed a custom-fitted LSO by Igbokwe, which Lumax billed under HCPCS Code L0627, were also, several weeks later, prescribed a second custom-fitted LSO by Igbokwe, which Lumax billed under HCPCS Code L0637.

131.    In each of the claims where Igbokwe prescribed and Lumax dispensed multiple LSOs to Insureds, the medical records submitted to GEICO contained no legitimate medical justification to support prescribing a single custom-fitted LSO to the Insured, let alone two.

132.    In addition to the items identified above, Igbokwe also frequently prescribed Insureds the following items that were dispensed by Lumax: (i) mattress; (ii) electric heating pad;

(iii) water circulating pad with pump; (iv) bed board; (v) orthopedic car seat; (vi) lumbar cushion; (vii) cervical collar; and (viii) cervical traction equipment.

133.    By way of further example, many of the prescriptions that were used by DME Defendants to support the charges identified in Exhibit "1" were purportedly issued by Jordan Fersel, M.D. ("Fersel") and Demetrios Karakizis, D.C. ("Karakizis") regarding Insureds treating at a Clinic located at 79-45 Metropolitan Avenue, Flushing. Despite the fact that multiple healthcare professionals issued DME prescriptions to Insureds at this Clinic, nearly every Insured was prescribed substantially similar sets of DME.

134.    Specifically, for almost every Insured where DME Defendants used prescriptions purportedly issued by Fersel and/or Karakizis to support the charges identified in Exhibit "1," the Insureds were prescribed the following items, regardless of whether the prescriptions were issued by Fersel, Karakizis, or a combination thereof: (i) a custom-fitted LSO; (ii) an electric heating pad; (iii) bed board; (iv) cervical collar; (v) mattress; (vi) massager; (viii) lumbar cushion; (ix) infrared heat lamp; (x) a whirlpool device; (xi) an orthopedic car seat; (xii) an EMS unit; and (xiii) cervical traction equipment.

135.    Underscoring that Fersel and Karakizis's prescriptions were issued pursuant to predetermined fraudulent protocols, many of Insureds who were initially prescribed a custom-fitted LSO by Fersel, which Lumax billed under HCPCS Code L0627, were also, several weeks later, prescribed a second custom-fitted LSO by Fersel or Karakizis, which Lumax billed under HCPCS Code L0637.

136.    In each of the claims where Fersel and/or Karakizis prescribed and Lumax dispensed multiple LSOs to Insureds, the medical records submitted to GEICO contained no

legitimate medical justification to support prescribing a single custom-fitted LSO to the Insured, let alone two.

137.    In addition to the items identified above, Fersel and/or Karakizis prescribed nearly every Insured that complained of a shoulder or knee injury with shoulder and knee orthotics, respectively, which were dispensed by Lumax.

138.    The above-listed Prescribing Providers and the descriptions of their fraudulent predetermined protocols are only examples.  In fact, virtually all of the Prescribing Providers purportedly issued prescriptions based on a fraudulent predetermined protocol that resulted in each Prescribing Provider consistently prescribing substantially similar, in not identical, Fraudulent Equipment to each of the Insureds they treated, which was then allegedly dispensed by Lumax.

### 2.    Improbably Identical Prescriptions Issued to Multiple Insureds in the Same Motor Vehicle Accident

139.    Not only did Insureds who treated with a specific Prescribing Provider often receive virtually identical prescriptions for a predetermined set of Fraudulent Equipment, but when two or more Insureds were injured in the same accident and treated by the same Prescribing Provider, the Insureds typically received virtually identical prescriptions for Fraudulent Equipment despite being different ages, in different physical conditions, differently situated in the same motor vehicle accident, and possessing discrete individual medical needs.

140.    It is improbable that two or more Insureds involved in any single motor vehicle accident would suffer substantially similar injuries or exhibit substantially similar symptomatology as the result of the accident.

141.    It is extremely improbable that two or more Insureds involved in any single motor vehicle accident not only would suffer from substantially similar injuries and symptomatology but

would need virtually the same specific items of DME and/or OD to aid in treating their individual symptoms.

142.    It is extremely improbable – to the point of impossibility – that this legitimately would occur over and over again, with two or more Insureds who were involved in the same accident repeatedly being prescribed virtually the same specific items of DME and/or OD to aid in treating their individual symptoms.

143.    In keeping with the fact that the Prescribing Providers prescribed predetermined sets of Fraudulent Equipment that were purportedly provided by the DME Defendants pursuant to fraudulent protocols – and not based upon medical necessity – the Prescribing Providers routinely provided virtually identical prescriptions for Fraudulent Equipment to two or more Insureds who were involved in the same accident.

144.    For example:

(i)    On October 7, 2021, two Insureds – DO and LO – were involved in the same automobile accident.  Thereafter, DO and LO presented to the Clinic located at 79-45 Metropolitan Avenue, Flushing. They were each prescribed the following virtually identical Fraudulent Equipment by Fersel and Karakizis:

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---------|-------------------|----------------|--------------|------------------|
| DO | October 21, 2021 (Fersel) | 1. Cervical Collar | L0180 | $233.00 |
|  |  | 2. Cervical Pillow | E0190 | $22.04 |
|  |  | 3. Lumbar Cushion | E2601 | $55.29 |
|  |  | 4. Lumbar Support | L0627 | $322.98 |
|  |  | 5. Eggcrate mattress | E0184 | $153.13 |
|  |  | 6. Electric Heating Pad | E0215 | $20.93 |
|  |  | 7. Bed Board | E0273 | $51.70 |
|  | November 11, 2021 (Fersel) | 8. EMS Unit | E0720 | $208.50 |
|  |  | 9. Infrared heat lamp | E0205 | $146.97 |
|  |  | 10. Whirlpool | E1310 | $340.50 |
|  |  | 11. Massager | E1399 | $128.32 |
|  | November 11, 2021 (Fersel) | 12. Knee Orthosis Custom Fitted | L1845 | $693.00 |

| | November 11, 2021 (Fersel) | 13. Shoulder Orthosis Custom Fitted | L3671 | $690.23 |
| | November 11, 2021 (Karakizis) | 14. LSO, APL Control | L0637 | $844.13 |
| | November 11, 2021 (Karakizis) | 15. Cervical Traction w/Pump | E0855 | $502.63 |

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| LO | October 21, 2021 (Karakizis) | 1. Cervical Collar<br>2. Cervical Pillow<br>3. Lumbar Cushion<br>4. Lumbar Support<br>5. Eggcrate mattress<br>6. Electric Heating Pad<br>7. Bed Board | L0180<br>E0190<br>E2601<br>L0627<br>E0184<br>E0215<br>E0273 | $233.00<br>$22.04<br>$55.29<br>$322.98<br>$153.13<br>$20.93<br>$51.70 |
| | November 11, 2021 (Fersel) | 8. EMS Unit<br>9. Infrared heat lamp<br>10. Whirlpool<br>11. Massager | E0720<br>E0205<br>E1310<br>E1399 | $208.50<br>$146.97<br>$340.50<br>$128.32 |
| | November 11, 2021 (Fersel) | 12. Knee Orthosis Custom Fitted | L1845 | $693.00 |
| | November 11, 2021 (Fersel) | 13. Shoulder Orthosis Custom Fitted | L3671 | $690.23 |
| | November 11, 2021 (Karakizis) | 14. LSO, APL Control | L0637 | $844.13 |
| | November 11, 2021 (Karakizis) | 15. Cervical Traction w/Pump | E0855 | $502.63 |

DO and LO were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment, which were used by Lumax to bill GEICO.

(ii)     On October 28, 2021, two Insureds – AV and RR – were involved in the same automobile accident.  Thereafter, AV and RR presented to the Clinic located at 79-45 Metropolitan Avenue, Flushing. They were each prescribed the following virtually identical Fraudulent Equipment by Fersel and Karakizis:

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---------|-------------------|----------------|--------------|------------------|
| AV | November 3, 2021 (Fersel) | 1. Cervical Collar | L0180 | $233.00 |
| | | 2. Cervical Pillow | E0190 | $22.04 |
| | | 3. Lumbar Cushion | E2601 | $55.29 |
| | | 4. Lumbar Support | L0627 | $322.98 |
| | | 5. Eggcrate mattress | E0184 | $153.13 |
| | | 6. Electric Heating Pad | E0215 | $20.93 |
| | | 7. Bed Board | E0273 | $51.70 |
| | December 2, 2021 (Fersel) | 8. EMS unit | E0720 | $208.50 |
| | | 9. EMS belt | E0700 | $15.15 |
| | | 10. Infrared heat lamp | E0205 | $146.97 |
| | | 11. Whirlpool | E1310 | $340.50 |
| | | 12. Massager | E1399 | $128.32 |
| | December 2, 2021 (Fersel) | 13. Knee Orthosis Custom Fitted | L1845 | $693.00 |
| | December 2, 2021 (Fersel) | 14. Shoulder Orthosis Custom Fitted | L3671 | $690.23 |
| | December 2, 2021 (Karakizis) | 15. LSO, APL Control | L0637 | $844.13 |
| | December 2, 2021 (Karakizis) | 16. Cervical Traction w/Pump | E0855 | $502.63 |

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---------|-------------------|----------------|--------------|------------------|
| RR | November 3, 2021 (Fersel) | 1. Cervical Collar | L0180 | $233.00 |
| | | 2. Cervical Pillow | E0190 | $22.04 |
| | | 3. Lumbar Cushion | E2601 | $55.29 |
| | | 4. Lumbar Support | L0627 | $322.98 |
| | | 5. Eggcrate mattress | E0184 | $153.13 |
| | | 6. Electric Heating Pad | E0215 | $20.93 |
| | | 7. Bed Board | E0273 | $51.70 |
| | December 2, | 8. EMS unit | E0720 | $208.50 |

|  | 2021 (Fersel) | 9. EMS belt | E0700 | $15.15 |
|  |  | 10. Infrared heat lamp | E0205 | $146.97 |
|  |  | 11. Whirlpool | E1310 | $340.50 |
|  |  | 12. Massager | E1399 | $128.32 |
|  | December 2, 2021 (Fersel) | 13. Knee Orthosis Custom Fitted (R) | L1845 | $693.00 |
|  | December 2, 2021 (Fersel) | 14. Knee Orthosis Custom Fitted (L) | L1845 | $693.00 |
|  | December 2, 2021 (Fersel) | 15. Shoulder Orthosis Custom Fitted | L3671 | $690.23 |
|  | December 2, 2021 (Karakizis) | 16. LSO, APL Control | L0637 | $844.13 |
|  | December 2, 2021 (Karakizis) | 17. Cervical Traction w/Pump | E0855 | $502.63 |

AV and RR were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment, which were used by Lumax to bill GEICO.

(iii)   On November 11, 2021, two Insureds – IV and JV – were involved in the same automobile accident.  Thereafter, IV and JV presented to the Clinic located at 79-45 Metropolitan Avenue, Flushing. They were each prescribed the following virtually identical Fraudulent Equipment by Fersel and Karakizis:

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| IV | November 17, 2021 (Fersel) | 1. Cervical Collar | L0180 | $233.00 |
|  |  | 2. Cervical Pillow | E0190 | $22.04 |
|  |  | 3. Lumbar Cushion | E2601 | $55.29 |
|  |  | 4. Lumbar Support | L0627 | $322.98 |
|  |  | 5. Eggcrate mattress | E0184 | $153.13 |
|  |  | 6. Electric Heating Pad | E0215 | $20.93 |
|  |  | 7. Bed Board | E0273 | $51.70 |
|  | December 12, 2021 (Fersel) | 8. Shoulder Orthosis Custom Fitted | L3671 | $690.23 |

| | | | | |
|---|---|---|---|---|
| | December 21, 2021 (Fersel) | 9. EMS belt<br>10. Infrared heat lamp<br>11. Whirlpool<br>12. Massager | E0700<br>E0205<br>E1310<br>E1399 | $15.15<br>$146.97<br>$340.50<br>$128.32 |
| | December 21, 2021 (Fersel) | 13. Knee Orthosis Custom Fitted | L1845 | $693.00 |
| | December 21, 2021 (Karakizis) | 14. Cervical Traction w/Pump | E0855 | $502.63 |
| | December 21, 2021 (Karakizis) | 15. LSO, APL Control | L0637 | $844.13 |

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| JV | November 17, 2021 (Fersel) | 1. Cervical Collar<br>2. Cervical Pillow<br>3. Lumbar Cushion<br>4. Lumbar Support<br>5. Eggcrate mattress<br>6. Electric Heating Pad<br>7. Bed Board | L0180<br>E0190<br>E2601<br>L0627<br>E0184<br>E0215<br>E0273 | $233.00<br>$22.04<br>$55.29<br>$322.98<br>$153.13<br>$20.93<br>$51.70 |
| | December 21, 2021 (Fersel) | 8. EMS belt<br>9. Infrared heat lamp<br>10. Whirlpool<br>11. Massager | E0700<br>E0205<br>E1310<br>E1399 | $15.15<br>$146.97<br>$340.50<br>$128.32 |
| | December 21, 2021 (Fersel) | 12. Knee Orthosis Custom Fitted | L1845 | $693.00 |
| | December 21, 2021 (Fersel) | 13. Shoulder Orthosis Custom Fitted | L3671 | $690.23 |
| | December 21, 2021 (Karakizis) | 14. LSO, APL Control | L0637 | $844.13 |
| | December 21, 2021 (Karakizis) | 15. Cervical Traction w/Pump | E0855 | $502.63 |

IV and JV were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment, which were used by Lumax to bill GEICO.

(iv)    On June 6, 2021, four Insureds – CC, JC, JV, and HV – were involved in the same automobile accident.    Thereafter, CC, JC, JV, and HV presented to the Clinic located at 79-45 Metropolitan Avenue, Flushing. They were each prescribed the following nearly identical Fraudulent Equipment by Fersel and Karakizis:

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---------|-------------------|----------------|--------------|------------------|
| CC | October 11, 2021 (Fersel) | 1. EMS Unit<br>2. Infrared heat lamp<br>3. Whirlpool<br>4. Massager | E0720<br>E0205<br>E1310<br>E1399 | $208.50<br>$146.97<br>$340.50<br>$128.32 |
| | October 11, 2021 (Fersel) | 5. Shoulder Orthosis Custom Fitted | L3671 | $690.23 |
| | October 11, 2021 (Karakizis) | 6. LSO, APL Control | L0637 | $844.13 |
| | October 11, 2021 (Karakizis) | 7. Cervical Traction w/Pump | E0855 | $502.63 |

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---------|-------------------|----------------|--------------|------------------|
| JC | October 11, 2021 (Fersel) | 1. EMS Unit<br>2. Infrared heat lamp<br>3. Whirlpool<br>4. Massager | E0720<br>E0205<br>E1310<br>E1399 | $208.50<br>$146.97<br>$340.50<br>$128.32 |
| | October 11, 2021 (Fersel) | 5. Shoulder Orthosis Custom Fitted | L3671 | $690.23 |
| | October 11, 2021 (Karakizis) | 6. LSO, APL Control | L0637 | $844.13 |
| | October 11, 2021 (Karakizis) | 7. Cervical Traction w/Pump | E0855 | $502.63 |

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| JV | October 11, 2021 (Fersel) | 1. EMS Unit<br>2. Infrared heat lamp<br>3. Whirlpool<br>4. Massager | E0720<br>E0205<br>E1310<br>E1399 | $208.50<br>$146.97<br>$340.50<br>$128.32 |
| | October 11, 2021 (Fersel) | 5. Shoulder Orthosis Custom Fitted | L3671 | $690.23 |
| | October 11, 2021 (Karakizis) | 6. LSO, APL Control | L0637 | $844.13 |
| | October 11, 2021 (Karakizis) | 7. Cervical Traction w/Pump | E0855 | $502.63 |
| | October 11, 2021 (Fersel) | 8. Knee Orthosis Custom Fitted | L1845 | $693.00 |

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| HV | October 11, 2021 (Fersel) | 1. EMS Unit<br>2. Infrared heat lamp<br>3. Whirlpool<br>4. Massager | E0720<br>E0205<br>E1310<br>E1399 | $208.50<br>$146.97<br>$340.50<br>$128.32 |
| | October 11, 2021 (Fersel) | 5. Shoulder Orthosis Custom Fitted | L3671 | $690.23 |
| | October 11, 2021 (Karakizis) | 6. LSO, APL Control | L0637 | $844.13 |
| | October 11, 2021 (Karakizis) | 7. Cervical Traction w/Pump | E0855 | $502.63 |
| | October 11, 2021 (Fersel) | 8. Knee Orthosis Custom Fitted | L1845 | $693.00 |

CC, JC, JV, and HV were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so,

these Insureds were purportedly issued nearly identical prescriptions for Fraudulent Equipment, which were used by Lumax to bill GEICO.

(v)     On August 31, 2021, three Insureds – LA, CA, and RE – were involved in the same automobile accident. Thereafter, LA, CA, and RE presented to the Clinic located at 1735 Pitkin Avenue, Brooklyn. They were each prescribed the following nearly identical Fraudulent Equipment by Bu:

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---------|-------------------|----------------|--------------|------------------|
| LA | September 8, 2021 | 1. Cervical Collar | L0180 | $233.00 |
| | | 2. Cervical Pillow | E0190 | $22.04 |
| | | 3. Lumbar Cushion | E2601 | $55.29 |
| | | 4. LSO | L0627 | $322.98 |
| | | 5. Mattress | E0184 | $153.13 |
| | | 6. Car seat | E2602 | $107.95 |
| | | 7. Bed Board | E0273 | $63.00 |
| | | 8. Massager | E1399 | $128.32 |
| | | 9. Water Circulating Heat Pad | E0217 | $239.99 |
| | | 10. Shoulder Support | L3670 | $111.07 |
| | October 7, 2021 | 11. Infrared Heat Lamp | E0205 | $146.97 |
| | | 12. Lumbar Traction w/pump | E0900 | $78.54 |
| | | 13. Cervical Traction w/pump | E0849 | $371.70 |
| | | 14. Whirlpool | E1310 | $340.50 |
| | November 11, 2021 | 15. Cervical Traction | E0855 | $502.63 |
| | November 18, 2021 | 16. LSO, APL Control | L0637 | $844.13 |

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---------|-------------------|----------------|--------------|------------------|
| CA | September 8, 2021 | 1. Cervical Collar | L0180 | $233.00 |
| | | 2. Cervical Pillow | E0190 | $22.04 |
| | | 3. Lumbar Cushion | E2601 | $55.29 |
| | | 4. LSO | L0627 | $322.98 |
| | | 5. Mattress | E2602 | $107.95 |
| | | 6. Bed Board | E0273 | $63.00 |
| | | 7. Massager | E1399 | $128.32 |
| | | 8. Water Circulating Heat Pad | E0217 | $239.99 |
| | October 7, 2021 | 9. Infrared Heat Lamp | E0205 | $146.97 |
| | | 10. Lumbar Traction w/pump | E0900 | $78.54 |
| | | 11. Cervical Traction w/pump | E0849 | $371.70 |

| | November 11, 2021 | 12. Whirlpool | E1310 | $340.50 |
| | | 13. Cervical Traction | E0855 | $502.63 |
| | | 14. Shoulder Orthosis Custom Fitted | L3671 | $690.23 |

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---------|-------------------|----------------|--------------|------------------|
| RE | September 8, 2021 | 1. Cervical Collar | L0180 | $233.00 |
| | | 2. Cervical Pillow | E0190 | $22.04 |
| | | 3. Lumbar Cushion | E2601 | $55.29 |
| | | 4. LSO | L0627 | $322.98 |
| | | 5. Mattress | E0184 | $153.13 |
| | | 6. Bed Board | E0273 | $63.00 |
| | | 7. Massager | E1399 | $128.32 |
| | | 8. Water Circulating Heat Pad | E0217 | $239.99 |
| | | 9. Shoulder Support | L3670 | $111.07 |
| | October 7, 2021 | 10. Infrared Heat Lamp | E0205 | $146.97 |
| | | 11. Lumbar Traction w/pump | E0900 | $78.54 |
| | | 12. Cervical Traction w/pump | E0849 | $371.70 |
| | | 13. Whirlpool | E1310 | $340.50 |
| | November 11, 2021 | 14. Cervical Traction | E0855 | $502.63 |
| | | 15. LSO, APL Control | L0637 | $844.13 |

LA, CA, and RE were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued nearly identical prescriptions for Fraudulent Equipment, which were used by Lumax to bill GEICO.

(vi)     On July 5, 2021, two Insureds – APS and CR – were involved in the same automobile accident. Thereafter, AP and CR presented to the Clinic located at 1735 Pitkin Avenue, Brooklyn. They were each prescribed the following virtually identical Fraudulent Equipment by Bu:

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---------|-------------------|----------------|--------------|------------------|
| AP | August 18, 2018 | 1. LSO, APL Control | L0637 | $844.13 |
| | | 2. Cervical Traction | E0855 | $502.63 |

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---------|-------------------|----------------|--------------|------------------|
| CR | August 18, | 1. LSO, APL Control | L0637 | $844.13 |

| | 2018 | 2. Cervical Traction | E0855 | $502.63 |
|---|---|---|---|---|

AP and CR were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment, which were used by Lumax to bill GEICO.

(vii)    On May 19, 2019, two Insureds – RH and KW – were involved in the same automobile accident.  Thereafter, RH and KW presented to the Clinic located at 137-42 Guy R Brewer Boulevard, Jamaica They were each prescribed the following nearly identical Fraudulent Equipment by Choi:

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| RH | October 19, 2021 | 1. Cervical Collar | L0180 | $233.00 |
| | | 2. Orthopedic Pillow | E0190 | $22.04 |
| | | 3. Lumbar Cushion | E2601 | $55.29 |
| | | 4. LSO | L0627 | $322.98 |
| | | 5. Eggcrate Mattress | E0184 | $153.13 |
| | | 6. Bed Board | E0273 | $51.70 |
| | | 7. Water Circulating Heat Pad | E0217 | $239.99 |
| | | 8. Electric Heating Pad | E0215 | $20.93 |
| | | 9. Hot/Cold Pack | A9273 | $5.40 |
| | | 10. Orthopedic Wrist Support | L3807 | $168.86 |
| | November 16, 2021 | 11. LSO Custom | L0637 | $844.13 |
| | November 18, 2021 | 12. EMS Unit | E0720 | $208.50 |
| | | 13. EMS belt | E0700 | $15.15 |
| | | 14. Infrared Heat Lamp | E0205 | $146.97 |
| | | 15. Electric Massager | E1399 | $128.32 |
| | | 16. Whirlpool | E1310 | $340.50 |

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
|---|---|---|---|---|
| KW | October 19, 2021 | 1. Cervical Collar | L0180 | $233.00 |
| | | 2. Orthopedic Pillow | E0190 | $22.04 |
| | | 3. Lumbar Cushion | E2601 | $55.29 |
| | | 4. LSO | L0627 | $322.98 |
| | | 5. Eggcrate Mattress | E0184 | $153.13 |
| | | 6. Bed Board | E0273 | $51.70 |
| | | 7. Water Circulating Heat Pad | E0217 | $239.99 |
| | | 8. Electric Heating Pad | E0215 | $20.93 |

|  |  | 9. Hot/Cold Pack | A9273 | $5.40 |
| --- | --- | --- | --- | --- |
|  | November 16, 2021 | 10. LSO Custom | L0637 | $844.13 |
|  | November 18, 2021 | 11. EMS Unit | E0720 | $208.50 |
|  |  | 12. EMS belt | E0700 | $15.15 |
|  |  | 13 Infrared Heat Lamp | E0205 | $146.97 |
|  |  | 14. Electric Massager | E1399 | $128.32 |
|  |  | 15. Whirlpool | E1310 | $340.50 |
|  | January 14, 2022 | 16. Custom Shoulder | L3671 | $690.23 |

RH and KW were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued virtually identical prescriptions for Fraudulent Equipment, which were used by Lumax to bill GEICO.

(viii)   On January 10, 2022, two Insureds – LC and JW – were involved in the same automobile accident.  Thereafter, LC and JW presented to the Clinic located at 1735 Pitkin Avenue, Brooklyn. They were each prescribed the following nearly identical Fraudulent Equipment by Bu:

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
| --- | --- | --- | --- | --- |
| LC | January 10, 2022 | 1. Cervical Collar | L0180 | $233.00 |
|  |  | 2. Cervical Pillow | E0190 | $22.04 |
|  |  | 3. Lumbar Cushion | E2601 | $55.29 |
|  |  | 4. LSO | L0627 | $322.98 |
|  |  | 5. Mattress | E0184 | $153.13 |
|  |  | 6. Car seat | E2602 | $107.95 |
|  |  | 7. Bed Board | E0273 | $63.00 |
|  |  | 8. Massager | E1399 | $128.32 |
|  |  | 9. Water Circulating Heat Pad | E0217 | $239.99 |

| Patient | Prescription Date | DME Prescribed | Billing Code | Charges to GEICO |
| --- | --- | --- | --- | --- |
| JW | January 10, 2022 | 1. Cervical Collar | L0180 | $233.00 |
|  |  | 2. Cervical Pillow | E0190 | $22.04 |
|  |  | 3. Lumbar Cushion | E2601 | $55.29 |
|  |  | 4. LSO | L0627 | $322.98 |
|  |  | 5. Mattress | E0184 | $153.13 |
|  |  | 6. Bed Board | E0273 | $63.00 |
|  |  | 7. Massager | E1399 | $128.32 |

| | | 8. Water Circulating Heat Pad | E0217 | $239.99 |
| | | 9. EMS Unit | E0720 | $208.50 |
| | | 10. EMS belt | E0700 | $15.15 |

LC and JW were in different physical conditions and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds were purportedly issued nearly identical prescriptions for Fraudulent Equipment, which were used by Lumax to bill GEICO.

145.    These are only representative examples.

146.    In many of the claims identified in Exhibit "1," two or more Insureds involved in the same underlying accident were prescribed virtually identical prescriptions for Fraudulent Equipment that were used by the DME Defendants to bill GEICO, despite the fact that the Insureds were differently situated.

147.    The DME Defendants knew that the prescriptions from the Prescribing Providers that supported the charges for Fraudulent Equipment identified in Exhibit "1" were issued pursuant to a predetermined fraudulent protocol and then used those prescriptions to support the fraudulent charges identified in Exhibit "1" solely for their own financial enrichment.

148.    In keeping with the fact that the prescriptions for the Fraudulent Equipment identified in Exhibit "1" were part of predetermined fraudulent protocols – and not based upon medical necessity – the prescriptions for the Fraudulent Equipment were never given to the Insureds but were routed directly to the DME Defendants.

149.    All of the charges for Fraudulent Equipment identified in Exhibit "1" were not medically necessary and were provided as part of predetermined fraudulent protocols.  As such, the DME Defendants were never eligible for reimbursement of No-Fault Benefits.

**D.    The Improper Distribution of Fraudulent Equipment to Insureds by the Defendants Without Prescriptions Identifying Medically Necessary DME**

150.    Lumax is not a licensed medical professional corporation, and Balykov is not a licensed healthcare professional. As such, the DME Defendants were not lawfully permitted to prescribe or otherwise determine what DME or OD is medically necessary for the Insureds. For the same reason, the DME Defendants cannot properly dispense DME or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies medically necessary DME and/or OD to be provided.

151.    However, in many of the fraudulent claims identified in Exhibit "1," the DME Defendants improperly decided what DME and/or OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider to the extent that they actually provided any DME and/or OD to the Insureds.

152.    More specifically, the prescriptions for OD purportedly issued by the Prescribing Providers and provided to the DME Defendants did not definitively identify medically necessary DME and/or OD to be provided to the Insureds. For example, the prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Defendants to a unique type of DME and/or OD.

153.    To the extent that some of the fraudulent claims identified in Exhibit "1" were based upon prescriptions that contained HCPCS Codes next to the descriptions of DME and/or OD, the prescriptions were still vague as the HCPCS Code identified on the prescription did not correspond with the description next to the code. Accordingly, the DME Defendants used vague and generic prescriptions to improperly decide what DME and OD to provide Insureds.

154.    Though the Prescribing Providers issued vague and generic prescriptions, the DME Defendants did not obtain any additional documentation from the Prescribing Providers to approve

or otherwise acknowledge the specific types of DME and/or OD that was medically necessary for the Insureds.

155.    In fact, the DME Defendants purposefully failed to seek supporting documentation to clarify the type of DME and/or OD to provide Insureds solely for their own financial gain.

156.    In a legitimate clinical setting, when a DME/OD supplier would obtain a prescription that did not contain a HCPCS Code or a sufficient description to identify a specific item of DME and/or OD, the DME/OD supplier would contact the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements to dispense the appropriate DME and/or OD prescribed to each patient.

157.    As also part of a legitimate clinical setting, the DME/OD supplier would have the referring healthcare provider sign documentation to confirm that the specific item of DME and/or OD – identified by HCPCS Code or a detailed description – was medically necessary for the patient.

158.    Upon information and belief, the DME Defendants never contacted the Prescribing Providers to seek instruction and/or clarification, but rather made their own determination as to which specific item of Fraudulent Equipment to purportedly provide to each Insured. Not surprisingly, the DME Defendants elected to provide the Insureds with Fraudulent Equipment that had reimbursement rates on the higher-end of the permissible range under the Fee Schedule.

159.    For example, based upon vague and generic prescriptions for a "lumbosacral orthosis," "lumbar support," or "LSO," the DME Defendants improperly decided what type of OD to provide Insureds – to the extent any items were actually provided.

160.    It is impossible for any unlicensed healthcare professional to determine, based solely upon the vague and generic descriptions for a "lumbosacral orthosis," "lumbar support," or

"LSO," what item is medically necessary for a specific Insured given that these descriptions directly relate to the over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds, including:

(i)     HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated, and off-the-shelf, which has a maximum reimbursement rate of $43.27.

(ii)    HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

(iii)   HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(iv)    HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated, and off-the-shelf, which has a maximum reimbursement rate of $65.92.

(v)     HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(vi)    HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii)   HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $806.64.

(viii)  HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $1,150.00.

(ix)    HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x)     HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi)    HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii)     HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xiii)    HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv)    HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xv)     HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvi)    HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xvii)   HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii)  HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix)    HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xx)     HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi)    HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii)   HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii)  HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

161.    As unlicensed healthcare providers, the DME Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured based upon a vague prescription for a "lumbosacral orthosis," "lumbar support," or "LSO."

162.    However, the DME Defendants never contacted the Prescribing Providers to clarify which of the twenty-three (23) options was medically necessary for each Insured, and instead decided themselves which specific type of Fraudulent Equipment they would bill GEICO for.

163.    In fact, each and every time that the DME Defendants received a prescription from the Referring Providers for a "lumbosacral orthosis," "lumbar support," or "LSO," the DME Defendants billed GEICO using HCPCS Code L0627 requesting a reimbursement of $322.98, and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to GEICO.

164.    Furthermore, each and every time that the DME Defendants received a prescription from the Prescribing Providers for a "LSO custom" or "LSO w/APL control," the DME Defendants billed GEICO using HCPCS Code L0637, which is for a custom-fitted device, requesting a reimbursement of $844.13 and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to GEICO.

165.    These are only representative examples. To the extent that the DME Defendants actually provided Fraudulent Equipment, they unlawfully prescribed the Fraudulent Equipment for virtually all of the claims identified in Exhibit "1" that are based upon vague and generic prescriptions because the DME Defendants decided which specific items of DME and/or OD to provide to the Insureds.

166.    In all of the claims identified in Exhibit "1" that were based upon vague and generic language contained in the prescriptions, the DME Defendants falsely represented that the

Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME and/or OD issued by healthcare providers with lawful authority to do so. To the contrary, the Fraudulent Equipment was purportedly provided by the DME Defendants based on their own determination of what unique types of Fraudulent Equipment to purportedly provide, and, thus, was not eligible for reimbursement of No-Fault Benefits.

### E. DME Defendants' Fraudulent Billing for DME and OD

167. The bills submitted to GEICO and other New York automobile insurers by the DME Defendants were also fraudulent in that they misrepresented the DME and OD purportedly provided to the Insureds.

168. In the bills and other documents submitted to GEICO, the DME Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were based upon some legitimate arms-length relationship, when the prescriptions for Fraudulent Equipment were based upon the unlawful kickback and patient referral arrangements between DME Defendants and others who are not presently identifiable.

169. In the bills and other documents submitted to GEICO, the DME Defendants also misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to unlawful financial arrangements between the DME Defendants and others who are presently unidentifiable.

170. Further, the DME Defendants misrepresented in the bills submitted to GEICO that the Fraudulent Equipment purportedly provided to Insureds were based upon prescriptions issued by licensed healthcare providers, when, in fact, laypersons decided what Fraudulent Equipment to purportedly provide.

171.    Moreover, and as explained below, the bills submitted to GEICO by the DME Defendants misrepresented, to the extent that any Fraudulent Equipment was provided: (i) the Fee Schedule items matched the HCPCS codes identified in the bills to GEICO, when they did not; and (ii) the charges for Non-Fee Schedule items were for permissible reimbursement rates, when they were not.

### 1. The DME Defendants' Fraudulently Misrepresented the Fee Schedule Items Purportedly Provided

172.    When the DME Defendants submitted bills to GEICO seeking payment for the Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

173.    Each HCPCS code is specifically defined and contains unique requirements that must be met in order for an item to qualify for reimbursement under the specific HCPCS code.

174.    In that regard, Palmetto provides specific characteristics and requirements that DME and OD must meet to qualify for reimbursement under a specific HCPCS code for both Fee Schedule items and Non-Fee Schedule items.

175.    By submitting bills to GEICO containing specific HCPCS codes, the DME Defendants represented that Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS codes contained within each bill.

176.    However, with the exception of codes relating to positioning pillows/cushions under HCPCS Code E0190 and electric heating pads under HCPCS Code E0215, in virtually all of the bills submitted to GEICO for Fee Schedule items, the DME Defendants fraudulently represented to GEICO that the HCPCS Codes were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

177.   The prescriptions from the Prescribing Providers contained vague and generic terms for Fraudulent Equipment to be provided to the Insureds. Using those prescriptions, the DME Defendants' submitted bills to GEICO containing HCPCS codes that represented a more expensive tier of Fee Schedule items than necessary and that could be provided based upon the type of equipment identified in the vague and generic prescriptions.

178.   As indicated above, as part of the unlawful financial arrangements between the DME Defendants and others who are not presently identifiable, the DME Defendants were provided with prescriptions purportedly issued by the Prescribing Providers pursuant to predetermined fraudulent protocols, which provided the DME Defendants with the opportunity to increase the amount they could bill GEICO for Fraudulent Equipment purportedly provided to Insureds.

179.   Accordingly, the DME Defendants obtained vague and generic prescriptions for Fraudulent Equipment that permitted them to choose between multiple types of products that would fit the vague description contained on the prescription.

180.   Although several options were available to the DME Defendants based upon the vague and generic prescriptions, the Defendants virtually always billed GEICO – and likely other New York automobile insurers – using HCPCS Codes with higher reimbursement amounts than necessary, which was done so for their financial benefit.

181.   However, despite billing for Fee Schedule items using HCPCS Codes that had higher than necessary reimbursement amounts, to the extent that the Defendants provided any Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO severely misrepresented the type of Fee Schedule items purportedly provided to the Insureds.

182.    For example, as identified in the claims contained within Exhibit "1," the DME Defendants frequently submitted bills to GEICO for Fraudulent Equipment that was purportedly "custom made" or "custom fitted" for each Insured when – to the extent that the Fraudulent Equipment was actually provided to the Insureds – the DME Defendants never customized the Fraudulent Equipment as billed.

183.    For example, DME Defendants used the vague and generic language in the prescriptions purportedly issued from the Prescribing Providers to bill GEICO for the following "custom fitted" OD: (i) an LSO using HCPCS code L0627 with a charge of $322.98; (ii) an LSO using HCPCS code L0637 with a charge of $844.13; (iii) a knee orthotic using HCPCS code L1832 with a charge of $607.55; (iv) a knee orthotic using HCPCS code L1820 with a charge of $110.00; (v) a shoulder-elbow-wrist-hand orthotic using HCPCS code L3960 with a charge of $372.50; (vi) a shoulder-elbow-wrist-hand orthotic using HCPCS code L3962 with a charge of $499.12; (vi) an ankle-foot orthotic using HCPCS code L1971 with a charge of $331.47; (vii) a wrist-hand-finger orthotic using HCPCS code L3807 with a charge of $178.04; and (viii) a knee orthotic using HCPCS code L1845 with a charge of $693.00.

184.    In addition, DME Defendants used the vague and generic language in the prescriptions purportedly issued from the Prescribing Providers to bill GEICO for a "custom made" shoulder orthotic using HCPCS code L3671 with a charge of $690.23.

185.    However, the bills to GEICO for HCPCS codes L0627, L0637, L1832, L1820, L3960, L3962, L1971, L3807, L1845, and L3671 fraudulently misrepresented the type of Fraudulent Equipment the DME Defendants purportedly provided to Insureds as the OD the DME Defendants provided – to the extent that the Fraudulent Equipment was actually provided – were not reimbursable under the specific HCPCS codes billed to GEICO.

186.    The products assigned to HCPCS codes L0627, L0637, L1832, L1820, L3960, L3962, L1971, L3807, L1845, and L3671 are a different type of OD that have been custom made or customized to fit a specific patient by an individual with expertise.

187.    However, despite billing GEICO, and other New York automobile insurers, using HCPCS codes L0627, L0637, L1832, L1820, L3960, L3962, L1971, L3807, L1845, and L3671, the specific orthotic provided by the DME Defendants – to the extent that they were provided at all – were never custom made or customized to fit each patient by an individual with the requisite expertise.

188.    In keeping with the fact that the claims identified in Exhibit "1" for custom-made and/or custom-fitted OD, including the claims for HCPCS codes L0627, L0637, L1832, L1820, L3960, L3962, L1971, L3807, L1845, and L3671, fraudulently misrepresented that the DME Defendants satisfied all the requirements for the billed HCPCS codes, upon information and belief, the DME Defendants did not, and could not have, custom-made or custom-fitted the OD as required.

189.    To the extent that any of the charges identified in Exhibit "1" for custom-made and/or custom-fitted OD, including the claims for HCPCS codes L0627, L0637, L1832, L1820, L3960, L3962, L1971, L3807, L1845, and L3671, were provided, the DME Defendants never customized the equipment as required by Palmetto.

190.    In order to help clarify the term "custom fitted," Palmetto defined a custom fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See

Palmetto, <u>Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.</u>

191.    One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which is for an off-the-shelf orthotic means that "the beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) fall into this category." <u>See</u> Palmetto, <u>Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.</u>

192.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." <u>See</u> Palmetto, <u>Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.</u>

193.    In the claims identified in Exhibit "1" for custom-made and/or custom-fitted OD, including the claims for HCPCS codes L0627, L0637, L1832, L1820, L3960, L3962, L1971,

L3807, L1845, and L3671, the DME Defendants fraudulently misrepresented that they provided the Insureds with OD that was custom-made and/or custom-fitted as defined by Palmetto, by a certified orthotist.

194.    Instead, to the extent that the DME Defendants provided any Fraudulent Equipment billed to GEICO as custom-made and/or custom-fitted OD, including the charges for HCPCS codes L0627, L0637, L1832, L1820, L3960, L3962, L1971, L3807, L0180, L1845, and L3671, the DME Defendants dropped off the Fraudulent Equipment without taking any action to customize the OD. To the extent that the DME Defendants attempted to make any adjustments to the Insureds identified in Exhibit "1" that purportedly received customized OD, the DME Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

195.    In keeping with the fact that the DME Defendants misrepresented that they custom-made and/or custom-fitted OD purportedly provided to Insureds and billed to GEICO, Balykov is not a certified orthotist.

196.    In addition to submitting hundreds of fraudulent charges for custom-made and custom-fitted OD, the DME Defendants fraudulently misrepresented other Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – and billed to GEICO in order to maximize profits.

197.    The claims identified in Exhibit "1" for HCPCS codes E2602 and E2611 are examples of how the DME Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

198.    Each of the claims identified within Exhibit "1" for HCPCS codes E2602 and 2611 contained charge for $107.95 and $282.40, respectively, based upon a prescription for an "orthopedic car seat" or a "car seat."

199.    However, the product represented by HCPCS code E2602 is defined as a wheelchair seat cushion that is 22" or greater in width.

200.    Likewise, the product represented by HCPCS code E2611 is defined as a wheelchair back cushion that is less than 22" in width, including any mounting hardware.

201.    Despite billing GEICO – and other New York automobile insurers – using HCPCS codes E2602 and E2611, the items provided by the DME Defendants – to the extent that the DME Defendants provided the Insureds with any item in response to the prescriptions for a "orthopedic car seat" or a "car seat." – were not cushions for use with a wheelchair and did not include any mounting hardware.

202.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibit "1", who were provided with a cushion by the DME Defendants that was billed to GEICO under HCPCS codes E2602 and E2611, were in a wheelchair.

203.    To the extent that any items were actually provided to the Insureds for the charges identified in Exhibit "1" under HCPCS codes E2602 and E2611, the items were positioning cushions, which are Fee Schedule items listed under HCPCS code E0190. HCPCS code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

204.    Unlike the fraudulent charges for $107.95 and $282.40 for each lumbar cushion billed under HCPCS codes E2602 and E2611, respectively – and in keeping with the fact that the

fraudulent charges were part of the DME Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS code E0190.

205.    In each of the claims identified within Exhibit "1" where the DME Defendants billed for Fraudulent Equipment under HCPCS codes E2602 and E2611, each of the bills fraudulently misrepresented that the DME Defendants provided the Insureds with equipment in response to a prescription for a wheelchair cushion and that item satisfies the requirements of HCPCS codes E2602 and E2611.

206.    The claims identified in Exhibit "1" for HCPCS code E0184 is another example of how the DME Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

207.    The DME Defendants routinely submitted a charge of $153.13 using HCPCS code E0184 based upon prescriptions for an "eggcrate mattress" or "mattress."

208.    However, the product represented by HCPCS code E0184 is defined as a "Dry pressure mattress," which is an actual mattress, not a mattress pad.

209.    By contrast, to the extent that DME Defendants provided any items to Insureds when billing under HCPCS code E0184, the items dispensed were mattress pads/toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS code E0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

210.    The mattress pads/toppers actually dispensed by the DME Defendants – to the extent that they provided any mattress pads/toppers to Insureds – have a maximum reimbursement

rate of $19.48 for each mattress pad/topper, well below the fraudulent charges submitted to GEICO by the DME Defendants seeking $153.13 for each unit.

211.    In each of the claims identified within Exhibit "1" where the DME Defendants billed for Fraudulent Equipment under HCPCS code E0184, each of the bills fraudulently mispresented that the DME Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS code E0184.

212.    In sum, in virtually all of the claims for Fee Schedule items identified within Exhibit "1," to the extent that any Fraudulent Equipment was actually provided, the DME Defendants were ineligible to collect No-Fault Benefits because they fraudulently misrepresented that the items they dispensed met the requirements for the HCPCS codes identified in their billing to GEICO in order to increase the amount of No-Fault Benefits they could obtain.

### 2.    The DME Defendants' Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items

213.    When the DME Defendants' submitted bills to GEICO for Non-Fee Schedule items, the DME Defendants requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

214.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

215.    By submitting bills to GEICO for Non-Fee Schedule items, the DME Defendants represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

216.    However, in the vast majority of the charges to GEICO identified in Exhibit "1" for Non-Fee Schedule items, the DME Defendants fraudulently represented to GEICO that the reimbursement sought was <u>the lesser of</u>: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

217.    In reality, the DME Defendants submitted bills to GEICO with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

218.    The DME Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent that they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

219.    When the DME Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of the DME Defendants' acquisition cost of purportedly high-quality items. In actuality, the DME Defendants' legitimate acquisition cost for the low-quality items were significantly less.

220.    In keeping with the fact that the DME Defendants fraudulently misrepresented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely for their financial benefit, the DME Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by virtually never submitting a copy of their acquisition invoices in conjunction with their bills.

221.    DME Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the

invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

222.    Upon information and belief, the DME Defendants purposefully avoided researching the cost to the general public of the Non-Fee Schedule items that they purportedly provided because they knew that those items would be sold at significantly less than charges they submitted to GEICO and other automobile insurers.

223.    As part of this scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibit "1" virtually always misrepresented the permissible reimbursement amount.

224.    For example, the DME Defendants billed GEICO for hundreds of infrared heat lamps under HCPCS Code E0205 with charges of $146.97 or $148.50 per unit, falsely representing those fees as a permissible reimbursement amounts for the Non-Fee Schedule item.

225.    To the extent that any items were provided, the infrared lamps were low quality items, and the permissible reimbursement rate was significantly less than the amounts charged by the DME Defendants.

226.    In virtually all of the charges submitted to GEICO for infrared heat lamps, the DME Defendants fraudulently sought reimbursement for $146.97 or $148.50 per unit when the maximum reimbursement charge was significantly less than $146.97.

227.    In addition, the DME Defendants billed GEICO for hundreds of bed boards under HCPCS code E0273 with charges between $41.00 and $63.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

228.    To the extent that any items were provided, the bed boards provided to Insureds were low quality cardboard items and the permissible reimbursement rate was significantly less than the amounts charged by the DME Defendants.

229.    In virtually all of the charges submitted to GEICO for a bed board, the DME Defendants fraudulently sought reimbursement between $41.00 and $63.00 per unit when the maximum reimbursement charge was significantly less than $41.00.

230.    The DME Defendants also billed GEICO for massagers under HCPCS Code E1399 with a charge of $104.98 or $128.32 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

231.    To the extent that any items were provided, DME Defendants provided Insureds with low-quality models of massagers made in China that are available to the public at a fraction of the price billed to GEICO.

232.    In virtually all of the charges submitted to GEICO for massagers, the DME Defendants fraudulently sought reimbursement for $104.98 or $128.32 per unit when the maximum reimbursement charge was significantly less than $104.98.

233.    In sum, in virtually all of the claims identified within Exhibit "1" for Non-Fee Schedule items, to the extent that any Fraudulent Equipment was actually provided, the DME Defendants were ineligible to collect No-Fault Benefits because the DME Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges for Non-Fee Schedule items were the lesser of 150% of the acquisition cost or the cost to the general public.

## III.    The Fraudulent Billing the DME Defendants Submitted or Caused to be Submitted to GEICO

234.    To support their fraudulent charges, the DME Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of Lumax, seeking payment for Fraudulent Equipment.

235.    The NF-3 forms, HCFA-1500 forms, and treatment reports that the DME Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the DME Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits because, to the extent that the DME Defendants provided any Fraudulent Equipment, it was based upon: (a) unlawful kickback and patient referral arrangements with others who are not presently identifiable; (b) predetermined fraudulent protocols without regard for the medical necessity of the items; and (c) decisions made by laypersons not based upon lawful prescriptions from licensed healthcare providers for medically necessary items.;

(ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the DME Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the DME Defendants were not entitled to receive No-Fault Benefits because – to the extent that the DME Defendants provided any Fraudulent Equipment to the Insureds – the Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO the reimbursement amount for the sale and rental of Non-Fee Schedule items to the Insureds, to the extent that the DME Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, the DME Defendants were not entitled to receive No-Fault Benefits because – to the extent that the DME Defendants provided any Fraudulent Equipment to the Insureds – DME Defendants falsified the permissible reimbursement amount for Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

**IV.    The DME Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

236. The DME Defendants were legally and ethically obligated to act honestly and with integrity in connection with the provision of DME and OD to Insureds, and their actual submission of charges to GEICO.

237. To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the DME Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

238. Specifically, the DME Defendants knowingly misrepresented and concealed facts related to the unlawful kickback and patient referral arrangements that formed the basis for the prescriptions for Fraudulent Equipment that were provided to the DME Defendants and ultimately used as the basis to submit bills to GEICO, in order to prevent GEICO from discovering that the DME Defendants unlawfully exchanged kickbacks for patient referrals and that the Fraudulent Equipment were billed to GEICO to maximize financial gain without regard to genuine patient care.

239. The DME Defendants also knowingly misrepresented and concealed facts to prevent GEICO from discovering that, in many instances, at least some, if not all, of the Fraudulent Equipment for which DME Defendants billed was never provided to the Insureds.

240. Additionally, the DME Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment provided to the DME Defendants were – not based upon medical necessity but – based upon predetermined fraudulent protocols and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

241. Furthermore, the DME Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not

have the legal authority to issue medically necessary DME/OD, and not by an actual healthcare provider's prescription for medically necessary DME/OD, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

242. Even more, the DME Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the DME Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

243. Lastly, the DME Defendants knowingly misrepresented the permissible reimbursement amount for the Non-Fee Schedule items contained in the bills submitted by the DME Defendants to GEICO in order to prevent GEICO from discovering that the sale and rental of Non-Fee Schedule items were billed to GEICO for impermissible financial gain.

244. The billing and supporting documentation submitted by the DME Defendants, when viewed in isolation, did not reveal its fraudulent nature.

245. Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate.

246. The DME Defendants hired a law firm to pursue collection of the fraudulent charges from GEICO and other insurers. This law firm routinely files expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

247. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent

charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $449,000.00 based upon the fraudulent charges.

248.    Based upon the DME Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Lumax
### (Declaratory Judgment Under 28 U.S.C. § 2201)

249.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

250.    There is an actual case in controversy regarding more than $330,000.00 in fraudulent billing that has been submitted to GEICO in the name of Lumax.

251.    Lumax has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity – but were submitted, pursuant to predetermined protocols designed solely to financially enrich Defendants, rather than to treat the Insureds.

252.    Lumax has no right to receive payment for any pending bills submitted to GEICO because Lumax provided Fraudulent Equipment, to the extent Lumax actually provided any Fraudulent Equipment, as a result of its participation in unlawful kickback and patient referral arrangements.

253.    Lumax has no right to receive payment for any pending bills submitted to GEICO because Lumax purportedly provided Fraudulent Equipment as a result of decisions made by

laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

254.    Lumax has no right to receive payment for any pending bills submitted to GEICO because – to the extent Lumax actually provided any Fraudulent Equipment – Lumax fraudulently misrepresented the Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the items provided to the Insureds.

255.    Lumax has no right to receive payment for any pending bills submitted to GEICO because – to the extent Lumax actually provided any Fraudulent Equipment – Lumax fraudulently misrepresented that the charges for Non-Fee Schedule items contained within the bills to GEICO were less than or equal to the maximum permissible reimbursement amount.

256.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the DME Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Lumax.

## SECOND CAUSE OF ACTION
### Against Balykov
### (Violation of RICO, 18 U.S.C. § 1962(c))

257.    GEICO repeats and realleges each and every allegation in the paragraphs set forth above.

258.    Lumax is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

259.    Balykov knowingly conducted and/or participated, directly or indirectly, in the conduct of Lumax's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for

over two years seeking payments that Lumax was not eligible to receive under the New York No-Fault laws because: (i) in every claim, Lumax submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions obtained through unlawful kickback and patient referral arrangements; (ii) in every claim, Lumax submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iii) in many claims, to the extent that Lumax actually provided DME/OD to Insureds, Lumax provided the Fraudulent Equipment pursuant to decisions by laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, to the extent that Lumax actually provided DME/OD to Insureds, Lumax mispresented the Fraudulent Equipment that it purportedly dispensed because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, Lumax misrepresented the permissible reimbursement rate for the Fraudulent Equipment purportedly provided. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

260.    Lumax's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Balykov operates Lumax, insofar as Lumax is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for Lumax to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Lumax continues to attempt collection on the fraudulent billing submitted by Lumax to the present day.

261.    Lumax is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Lumax in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

262.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $449,000.00 pursuant to the fraudulent bills submitted through Lumax.

263.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Balykov and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

264.    GEICO repeats and realleges each and every allegation in the paragraphs set forth above.

265.    Lumax is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

266.    Balykov and John Doe Defendants are the owners of, employed by, or associated with the Lumax enterprise.

267.    Balykov and John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Lumax's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Lumax was not eligible to receive under the New York No-Fault Laws because: (i)

in every claim, Lumax submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions obtained through unlawful kickback and patient referral arrangements; (ii) in every claim, Lumax submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iii) in many claims, to the extent that Lumax actually provided DME/OD to Insureds, Lumax provided the Fraudulent Equipment pursuant to decisions by laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, to the extent that Lumax actually provided DME/OD to Insureds, Lumax mispresented the Fraudulent Equipment that it purportedly dispensed because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (v) in many claims, to the extent that any Fraudulent Equipment was actually provided, Lumax misrepresented the permissible reimbursement rate for the Fraudulent Equipment purportedly provided. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

268.    Balykov and John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

269.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $449,000.00 pursuant to the fraudulent bills submitted through Lumax.

270.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against the DME Defendants**
**(Common Law Fraud)**

271.     GEICO repeats and realleges each and every allegation in the paragraphs set forth above.

272.     DME Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

273.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful kickback and patient referral arrangements, which were used to financial enrich those that participated in the scheme; (ii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iii) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment did not represent the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS

Codes billed to GEICO; and (v) the representation that the charges for Fraudulent Equipment were permissible when the charges exceeded the permissible reimbursement permitted under the No-Fault Laws.

274.    DME Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Lumax that were not compensable under the No-Fault Laws.

275.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $449,000.00 pursuant to the fraudulent bills submitted through Lumax.

276.    DME Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

277.    Accordingly, by virtue of the foregoing, GEICO is entitled to recover compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against the DME Defendants
### (Unjust Enrichment)

278.    GEICO repeats and realleges each and every allegation in the paragraphs set forth above.

279.    As set forth above, the DME Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

280.    When GEICO paid the bills and charges submitted by or on behalf of Lumax for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the DME Defendants' improper, unlawful, and/or unjust acts.

281.     The DME Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the DME Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

282.     The DME Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

283.     By reason of the above, the DME Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $449,000.00.

## JURY DEMAND

284.     Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants as follows:

A.     On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Lumax has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Balykov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $449,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Balykov and John Doe Defendants, compensatory damages in an amount to be determined at trial but in excess of $449,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against DME Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $449,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

E.      On the Fifth Cause of Action against DME Defendants, more than $449,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: October 18, 2024
       Uniondale, New York

RIVKIN RADLER LLP

By:   /s/ Barry I. Levy
       Barry I. Levy, Esq.
       Michael A. Sirignano
       John P. Mulvaney
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*